# Exhibit 1

Fulton County Superior Court
***EFILED***LW
Date: 8/13/2024 3:17 PM
Che Alexander, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY
# STATE OF GEORGIA

BELLYARD PARTNERS, LLC, on behalf of itself and all others similarly situated,

        Plaintiff,

    v.

FALFURRIAS CAPITAL PARTNERS, LP, GLOBAL PLASMA SOLUTIONS INC.,

        Defendants.

Case No. ____24CV010221____

**JURY TRIAL DEMANDED**

# CLASS ACTION COMPLAINT

Plaintiff BELLYARD PARTNERS, LLC brings this action on behalf of itself and all others similarly situated against Defendants FALFURRIAS CAPITAL PARTNERS, LP and GLOBAL PLASMA SOLUTIONS, INC. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to itself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Falfurrias Capital Partners, LP ("Falfurrias" or "FCP") and Global Plasma Solutions Inc. ("GPS") prey on consumers desperate to cleanse the air and protect themselves and the public from ailments including the COVID-19 virus.

2.     Defendants represent that their Needlepoint Bipolar Ionization ("NPBI") technology and the products containing this technology (the "Products") eliminate the COVID-19 virus, even though these Products do not. [1]

3.     Defendants' "profits over people" scheme won them acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of the Plaintiff and Class Members throughout the State of Georgia.

4.     As part of this widescale fraud, Plaintiff was one of many that were harmed by Defendants' deceptions in the State of Georgia.

---

[1] The Products included with this definition include all products that used Defendant's NPBI technology. Presently this includes the GPS-FC48-AC, GPS-FC24-AC, GPS-DM48-AC, GPS-FC-3-BAS, GPS-IMOD, GPS-IRIB-18, and GPS-IRIB-36.

1

5.    While each Defendant benefited from these deceptions, Defendant Falfurrias benefited the greatest and received a $225,000,000 dividend just nine months after the declaration of the COVID-19 pandemic.

6.    To further its deception – while also hiding significant defects in its Products – Defendants deceptively represent company-funded testing as "independent" while also using test conditions that are not representative of the real-world use of the Products.

7.    "The worst thing that can happen is installing a product you believe is keeping you safe, but it's not."[2]  But that is precisely what Defendants are doing, instilling customers with a false sense of security through misleading claims.

8.    Further, Defendants overstate the Products' COVID-19 mitigation performance and uses methods that are "unvalidated"[3] and "under conditions that are not representative of actual application conditions."[4]

9.    For example, in one instance, Global Plasma Solutions used a chamber the size of a shoebox to support its claim that its Products could kill COVID-19 for a

---

[2] Quote from Global Plasma Solutions Vice President of Sales David Archer. *Why Your Customers Should Care About Their Indoor Air Quality* https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

[3] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't' Safe*, MONTCLAIR LOCAL (April 22, 2001), https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/.

[4] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.

home or school. In another instance, Global Plasma Solutions "blasted" the testing chambers with 27,000 ions per cubic centimeter – far in excess than concentrations achievable by its Products.

10.    In fact, GPS' founder and Chief Technology Officer, Charles Waddell, admits that the units sold to the public "actually deliver a lot less ion power – 13 times less – into a full-sized room."[5]

11.    When Defendants' Products have been independently tested in real world conditions, they consistently fail to achieve the results as represented by Defendants.

12.    COVID-19 has taken more than 1,200,000 American lives.

13.    In an effort to capture dollars from COVID-19 fear, Defendants market directly to people and entities seeking protection and relief from the virus.

14.    However, as Defendants know, the Products suffer from defects which cause the Products to fail to meet their lofty representations. Thus, the Defendants' representations that the Products are a safe technology to cleanse the air of the COVID-19 virus is false, misleading, and designed to deceive consumers into paying a price premium and choosing their products over a competitor's product.

15.    In pursuit of "profits over people," Defendants use many deceptive representations as described herein.

---

[5] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, CNN HEALTH (May 3, 2021), https://www.cnn.com/2021/05/03/health/air-filter-covid-scams-khn/index.html.

3

16.    For example, Defendants deceptively represented that the technology was installed in the White House for COVID mitigation:[6]

> A spokesperson for the company directed WIRED to research commissioned by the company showing the technology neutralized SARS-CoV-2 on surfaces and aerosols in lab settings, as well as case studies from customers including universities and the White House.

However, the technology was installed in 2018 – well before COVID-19 appeared.

17.    By 2022, the White House's Office of Science and Technology determined that "[d]evices that use 'bipolar ionization' are NOT recommended at this time."[7]

18.    Defendants manufacture, sell, and distribute the Products using marketing and advertising campaigns specifically targeted to consumers that are aware and fearful of the COVID-19 virus.

19.    For example, in GPS' CEO Glenn Brinckman's words, "it's all about pathogens and coronavirus and COVID-19."[8]

20.    Plaintiff and those similarly situated ("Class Members") relied on Defendants' misrepresentations.

---

[6] Gregory Barber, *The Ionizer in Your School May Not Do Much to Fight Covid*, WIRED (March 26, 2021), https://www.wired.com/story/ionizer-school-not-fight-covid/.

[7] Erica Kimmerling, *Clean Indoor Air Benefits Everyone*, THE WHITE HOUSE (Dec. 8, 2022), https://www.whitehouse.gov/ostp/news-updates/2022/12/08/clean-indoor-air-benefits-everyone.

[8] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

21.    Defendants' fraudulent, deceptive, and misleading conduct violated the laws of Georgia.

## PARTIES

22.    Plaintiff is a Georgia LLC with its principal place of business located in Fulton County, Georgia.

23.    Defendant Falfurrias Capital Partners, LP is a Delaware limited partnership with its principal place of business located in Charlotte, NC.

24.    Defendant Global Plasma Solutions, Inc. is a Delaware corporation with its principal place of business located in Charlotte, NC.

   a.    GPS was founded in 2008 in Savannah, Georgia.

   b.    From 2008 through 2018, it was known as Global Plasma Solutions LLC, a Georgia limited liability company.

   c.    In August 2018, after Defendant FCP acquired GPS, it formed Global Plasma Solutions, Inc. as a Delaware corporation. In October 2018, it was granted a Certificate of Authority to transact business in Georgia.

   d.    In August 2020, GPS withdrew its Certificate to transact business in Georgia.

25.    Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who have knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

26.     Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action because it is a court of general jurisdiction and the damages sought by Plaintiff individually and on behalf of Class Members exceeds $50,000, the jurisdictional threshold for this court.

28.     This Court has personal jurisdiction over the Defendants.

    a. This Court has general personal jurisdiction over all Defendants that are registered and authorized to do business in the State of Georgia.[9] *See Cooper Tire & Rubber Co. v. McCall*, 863 S.E.2d 81, 92 (Ga. 2021) (holding that a party registered and authorized to do business in the State of Georgia is "subject to the general jurisdiction of [Georgia] courts.").

---

[9] At the time of the solicitation, sale, and start of the installation of the devices to Plaintiff, Defendant GPS was registered to conduct business in Georgia. Shortly after the sale of the devices to Plaintiff, in August 2020, the Secretary of State for Georgia filed a Notice of Intent to Revoke Defendant GPS' certificate of authority to conduct business in Georgia. In response, Defendant GPS stated that it "no longer transacts business in Georgia" and applied to withdraw its certificate of authority.

b.  This Court further has specific personal jurisdiction over the Defendants under O.C.G.A. § 9-10-91(1), and (3) because they transact business within the State of Georgia and because they committed a tortious injury in the State of Georgia caused by an act or omission outside this State and they regularly do or solicit business, engage in any other persistent course of conduct, and/ or derive substantial revenue from goods used or consumed in the State of Georgia.

c.  This Court further has specific personal jurisdiction over the Defendants under O.C.G.A. § 9-10-91(1) and (2) because they transact business within the State of Georgia and because they committed a tortious act or omission within the State of Georgia.

29.    This Court is a proper venue for this action under O.C.G.A. § 9-10-93 because substantial tortious acts (as further detailed *infra*) and the injuries occurred at Plaintiff's business, which is located in Fulton County, Georgia.

## FACTS

### A. The Market for Air Treatment Systems

30.    The COVID-19 pandemic has caused demand for air treatment systems (ATS) to skyrocket.

31.    In 2020, the ATS market grew by 57% and is expected to have a double-digit growth rate in each of the next two years.[10]

---

[10] *Air Purifier Sales Surge in the U.S. Amid the COVID-19 Pandemic*, VERIFY MARKETS (January 26, 2021), https://www.globenewswire.com/news-

32.     Market growth at these rates is unprecedented.

33.     For example, one air filter company CEO was so overwhelmed with orders that he had to turn customers away and stated, "I've been in this business for 20 years and this is the most chaotic time I've ever had in the air filter business."[11]  In summary, he described the demand from customers as "like toilet paper in April [2020] times two."[12]

34.     As a result of COVID-19's airborne transmission, residential and commercial customers sought air treatment systems to ensure safety.

35.     COVID-19 has taken more than 1,200,000 American lives.

36.     Certain underlying medical conditions that are relatively common in the population produce a significantly increased risk of death when a person is infected with COVID-19.

37.     For example, one common underlying condition is age. Compared to the CDC reference group, adults aged 30-39 are 45x more likely to die from COVID and 10x more likely to be hospitalized.[13]

---

[11] Will Feuer, *Airborne Transmission of Coronavirus Has Made High-End Air Filtration Systems More Popular Than 'Toilet Paper in April' As HVAC Systems Sell Out*, CNBC (October 15, 2020), https://www.cnbc.com/2020/10/15/airborne-transmission-of-coronavirus-has-made-high-end-air-filtration-systems-more-popular-than-toilet-paper-in-april.html.

[12] *Id.* (referring to the demand for toilet paper during the onset of the pandemic that led to shortages, fights, and arrests as consumers battled for toilet paper).

[13] Center for Disease Control, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated April 16, 2021).

38.     With each successive age group, these numbers increase drastically until hitting frightening numbers for people aged 65 and above:

| Age Range | Death | Hospitalization |
|:---:|:---:|:---:|
| 65-74 | 1300x | 40x |
| 75-84 | 3200x | 65x |
| 85+ | 8700x | 95x |

39.     To protect people, locations that have high amounts of "foot traffic" in an indoor setting have invested in safety precautions to mitigate the spread of COVID-19.

40.     The feeling of safety and security is pivotal to the public. As a result, there is strong demand for goods and procedures that "may make people feel safer without actually being substantially safer."[14]

41.     Installation of air treatment systems has been one of the most popular mitigation efforts.

42.     Because of the strong likelihood of death for the elderly population, senior living facilities have invested heavily in air treatment systems.

43.     Because of the strong likelihood of children acting as super spreaders,[15] schools from coast to coast invested heavily in air treatment systems to protect not only the students and school staff but also their friends and family.

---

[14]Lindsay Christians, *Cold Comfort: With Winter On Its Way, Madison Restaurants Scramble To Stay Alive*, THE CAPITAL TIMES (November 7, 2020), https://madison.com/ct/entertainment/dining/cold-comfort-with-winter-on-its-way-madison-restaurants-scramble-to-stay-alive/article_2fdc210d-f78e-55cb-a251-96fc41516a1e.html.

[15] MGH News and Public Affairs, *Children's Role In Spread Of Virus Bigger Than Thought*, THE HARVARD GAZETTE (August 20, 2020),

44. Because of the strong desire to celebrate their faith in person, religious organizations throughout the country invested in air treatment systems to allow congregations to worship safely.

45. In addition to these public areas, similar concerns caused demand and interest to swell with residential owners and places offering overnight accommodations.

46. One survey found that the COVID-19 pandemic caused a 54% increase in consumer focus for indoor air quality in their homes.[16]

47. The Wall Street Journal labeled clean air as the next luxury apartment perk, and Elisa Orlanski Ours, Chief Planning and Design Officer for Corcoran Sunshine, stated, "Air quality is now front of mind for our buyers."[17]

48. Throughout every business sector and every home, demand for clean air and the equipment that creates the perception of clean air is growing exponentially.

49. To harness this demand, companies, like Defendants, have increased marketing efforts and product lines.

---

https://news.harvard.edu/gazette/story/2020/08/looking-at-children-as-the-silent-spreaders-of-sars-cov-2/.

[16] *New Survey Reveals Increased Concern for Air Quality and Safety in Homes*, PR NEWSWIRE (October 28, 2020), https://www.prnewswire.com/news-releases/new-survey-reveals-increased-concern-for-air-quality-and-safety-in-homes-301162159.html.

[17] Katy McLaughlin, *CLEAN AIR: THE NEXT LUXURY APARTMENT PERK*, WALL STREET JOURNAL (December 9, 2020), http://www.wsj.com/articles/clean-air-the-next-luxury-apartment-perk-11607526064.

## B. Global Plasma Solutions: The Company and the Products

50.    Global Plasma Solutions was founded in 2008 in Savannah, Georgia. The company's previous focus was providing energy savings solutions. However, when the COVID-19 pandemic hit, the company's focus shifted, and in CEO Glenn Brinckman's words, "it's all about pathogens and coronavirus and COVID-19."[18]

51.    The backbone of Global Plasma Solutions' product line is its patented Needlepoint Bipolar Ionization technology (NPBI).

52.    NPBI technology is used, *inter alia*, in the GPS-FC-3-BAS, GPS-FC48-AC, GPS-FC24-AC, GPS-DM48-AC, GPS-FC-3-BAS, GPS-IMOD, GPS-IRIB-18, and GPS-IRIB-36 devices.

## C. Global Plasma Solutions Represents to Consumers that Its Products Will Improve Air Quality Without Harmful Side Effects

53.    In marketing the Products, Defendants make numerous representations regarding the performance and abilities of its Products and the benefits purchasers should expect to gain therefrom.

54.    This uniform, widespread marketing campaign is coordinated to present universal representations concerning the effectiveness of the Products and the NPBI technology.

55.    These representations fall into a few broad categories:

---

[18] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

a. Representations that the Products are superior to other air treatment system technologies;

b. Representations that the Products produce cleaner air;

c. Representations that the Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes);

d. Representations that Defendants' assertions about the Products are based on "independent testing;"

e. Representations that attempt to capitalize on the COVID-19 pandemic.

56. These representations are false, misleading, and deceptive:

| Representation Category | False, Misleading, and Deceptive |
|---|---|
| Products are superior to other air treatment system technologies | Comparisons to other technologies are based on the other misrepresentations herein. |
| Products produce cleaner air | Independent studies show that the Products are not effective at cleaning the air in real world conditions. |
| Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes) | These benchmarks fail to be replicated in real world environments. |
| Defendants' assertions about the Products are based on "independent testing" | Defendants' testing is fundamentally flawed and biased because these company-funded studies are not "independent." Further, Defendants' test results are not replicated in real world conditions because Defendants' tests are carefully constructed in order to achieve the outcomes Defendants desire. |

| | Through a coordinated campaign to profit from COVID-19 fear, Defendants overstate the efficacy of the Products' ability to eliminate COVID-19. |
|---|---|
| Attempts to capitalize on the COVID-19 pandemic | |

57.    These representations were promulgated to the public through Defendant GPS' website, social media, YouTube videos, testimonials, third party publications, and other media. Below is a non-exhaustive selection of the representations made by Global Plasma Solutions concerning its NBPI Products.

58.    Defendants represent that the Products are <u>superior to other air treatment system technologies</u>.[19]

a.    "That's why GPS is committed to science and ongoing research to ensure we have **the safest**, **most effective technology on the market**." Charles Waddell, GPS' Founder and Chief Technology Officer.[20]

b.    "Most important, **unlike many other solutions on the market, GPS NPBI technology is also safe for occupied spaces.**"[21]

c.    In a podcast interview, shared on the Global Plasma Solutions' official Facebook page on June 15, 2020, Founder and CTO, Charlie Waddell states:[22]

---

[19] Emphasis added throughout.
[20] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.
[21] Global Plasma Solutions, *PROJECT SPOTLIGHT: Boston Children's Hospital*, https://globalplasmasolutions.com/articles/project-spotlight-boston-childrens-hospital.
[22] Global Plasma Solutions' Official Facebook Page, June 15, 2020, https://www.facebook.com/globalplasmasolutions/posts/190279179097329.

    i. "You know, half the filters and UV lights are what I consider passive devices, they sit there and they wait for stuff to come to them. **Our technology NPBI is actually going out into the space and seeking out these contaminants within the space. So that's really solving the problems as we see them today.** Where you have people talking coughing, sneezing, generating the actual contaminants in the space. So I would rather see a technology actively coming out into the space to treat those contaminants versus waiting for them to come back to the air handler to be reactive versus proactive."[23]

   d. In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant GPS' Founder and CTO:[24]

**% of SARS VIRUS CONTROLLED BASED ON TECHNOLOGY[1]**

| MERV Rating | Filter Only | Filter+UVC*** | Filter + Ionization*, ** |
|---|---|---|---|
| 6 | 6.2% | 10% | 34% |
| 7 | 7% | 12% | 61% |
| 8 | 11% | 19% | 84% |
| 10 | 12% | 35% | 89% |
| 13 | 46% | 84% | 97% |
| 15 | 71% | 97% | 99% |
| 16 | 76% | 98.80% | 99.90% |
| 17 (HEPA) | 99.90% | 99.99% | 99.999% |

*Ionization increases the filter efficiency 4-5 MERV levels – this column added by GPS
**Does not take into account ionization kills in the space and on surfaces
***UVC does not effectively kill airborne pathogens in high RH conditions[2]

---

[23] *Id.* at approximately the 4:00 minute mark.
[24] Global Plasma Solutions Presentation (conducted by Charlie Waddell), <u>How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization</u>, <u>https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf</u>.

14

e. In a sales presentation from September 1, 2020, Defendants compare their technology vs. competitor technologies:[25]



59. Additional promotional materials emphasize NPBI's ability to "Kill[]....Virus[es]" while claiming that competing technologies cannot:



---

[25] Global Plasma Solutions Sales Presentation, Better Air through Science, September 1, 2020, https://www.sde.idaho.gov/communications/files/public-records-requests/GPS-Presentation.pdf (slide 13).

60.    The Data Sheet for the GPS-FC-3-BAS claims that the device can kill

viruses:

> **Benefits:** Neutralizes Odors, Kills Mold, Bacteria and Virus, Helps to Control Allergens* and Asthma*, Particle Reduction, Smoke Control, Ease of Installation and Service and Prevents Dirty Sock Syndrome (DSS)

61.    Defendants represent that the Products <u>produce cleaner air</u>.[26]

a.    "**CLEANER AIR**, NATURALLY"[27]

b.    "Through our needlepoint bipolar ionization or NPBI® technology, **we deliver clean indoor air** ."[28]

c.    "NPBI is a proactive approach to **cleaner air**."[29]

d.    "This instantly results **in cleaner indoor air** and a safer environment."[30]

e.    GPS products provide an affordable, effective and low-maintenance **solution for cleaner air**.[31]

f.    "AN ENGINEERED SOLUTION FOR **CLEANER, SAFER** INDOOR AIR"[32]

---

[26] Emphasis added throughout.

[27] Global Plasma Solutions, <u>How It Works</u>, https://globalplasmasolutions.com/how-it-works.

[28] *Id.*

[29] Global Plasma Solutions, *The American Rescue Plan Can Help Schools Reopen Safely*, https://globalplasmasolutions.com/articles/the-american-rescue-plan-can-help-schools-reopen-safely-with-air-purification-technology.

[30] *Id.*

[31] *Id.*

[32] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

g. "The combined effect is air that is **cleaner and safer** to breathe."[33]

h. In March 2021, Global Plasma Solutions appointed Edward Sobek as the company's first Chief Science Officer. In the press release announcing his arrival, Mr. Sobek states: [34]

  i. "What is most compelling about NPBI is its ability to **clean air and surfaces** in the occupied space."

  ii. "This technology can help create **healthy environments** at home, at work, at school and beyond. I welcome the opportunity to further GPS' goal of improving indoor air quality for all."[35]

i. "Our patented needlepoint bipolar ionization (NPBI®) technology is a **proactive approach to cleaner air**."[36]

62.    Defendants represent that the Products can achieve toxin-removal benchmarks.[37]

---

[33] Global Plasma Solutions, *PROJECT SPOTLIGHT The Learning Experience*, https://globalplasmasolutions.com/articles/project-spotlight-the-learning-experience.
[34] Global Plasma Solutions, *Global Plasma Solutions® Appoints Edward Sobek as Chief Science Officer*, March 2, 2021, https://globalplasmasolutions.com/articles/indoor-air-quality-solutions-leader-global-plasma-solutions-appoints-edward-sobek-as-chief-science-officer (emphasis added).
[35] *Id.*
[36] Global Plasma Solutions, *The Japanese Industrial Standard for Ion Measurement*, https://globalplasmasolutions.com/articles/the-japanese-industrial-standard-for-ion-measurement.
[37] Emphasis added throughout.

a. "**Within 24 hours of installation**, NPBI technology **effectively**

**neutralized odors from all sources** entering these buildings."[38]For

example, the following tables appear on both the Defendant GPS'

"Independent Testing" and "Pathogen Reduction" pages:

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction |
|----------|-----------------|---------------------|-------------------|
| SARS-CoV-2 | 60 minutes | In-Air | **98.33%** |
| SARS-CoV-2 | 60 minutes | Surface | **99.98%** |

iii.

| Pathogen | Time in Chamber | Rate of Reduction |
|----------|-----------------|-------------------|
| Tuberculosis | 60 minutes | **69.1%** |
| MRSA | 30 minutes | **96.2%** |
| Staphylococcus | 30 minutes | **96.2%** |
| E. coli | 15 minutes | **99.7%** |

iv.

| Pathogen | Time in Chamber | Rate of Reduction |
|----------|-----------------|-------------------|
| Norovirus[i] | 30 minutes | **93.5%** |
| Human Coronavirus 229E* | 60 minutes | **99.0%** |
| Legionella | 30 minutes | **99.7%** |
| Clostridium Difficile | 30 minutes | **88.9%** |

v.

b. "The air purification system was able to target and reduce pathogens

and odors **within just 24 hours of installation**."[39]

---

[38] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*,
https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport.
[39] Global Plasma Solutions, *PROJECT SPOTLIGHT: Clean Room Applications*,
https://globalplasmasolutions.com/articles/project-spotlight-clean-room-applications.

    c.   "The GPS-iMOD **drastically reduced the exhaust fume odors within 24 hours** and **reduced the particles in the space by up to 85%.**"[40]

63.     Defendants represent that <u>their assertions about the Products are based on "independent testing."</u>[41]

    a.   "This process is **proven by independent laboratory testing** to be both safe and effective."[42]

    b.   In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant GPS' Founder and CTO:[43]

# *Independent Testing by World Renowned EMSL & ATS Labs*

    c.   On its website, under the "Independent Testing" page:[44]

---

[40] Global Plasma Solutions, *PROJECT SPOTLIGHT The University of Maryland, Baltimore,* <u>https://globalplasmasolutions.com/uploads/customer-resources/Resource-Library/Case-Studies/University-of-Maryland-Case-Study.pdf</u> (emphasis in original).
[41] Emphasis added throughout.
[42] Global Plasma Solutions, <u>Pathogen Reduction</u>, <u>https://globalplasmasolutions.com/pathogen-reduction</u>.
[43] Global Plasma Solutions Presentation (conducted by Charlie Waddell), <u>How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization</u>, <u>https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf</u>.
[44] Global Plasma Solutions, <u>Independent Testing</u>, <u>https://globalplasmasolutions.com/independent-testing</u>.

## *Independent Testing*

We put our needlepoint bipolar ionization (NPBI®) technology to the test: Third-party testing confirms it limits the spread of viruses.

i.

PERFORMANCE VALIDATION

*Third-party testing confirms: GPS gets the job done*

Our results-driven technology fights pathogens and limits the spread of viruses.

ii.

64.    Defendants' representations concerning the <u>COVID-19 pandemic</u>.[45]

a.    "While the **COVID-19 pandemic** has inspired virtually every industry to take steps toward ensuring cleaner, safer indoor air, Global Plasma Solutions (GPS) began tackling air purification long before the coronavirus emerged."[46]

b.    "**COVID-19 is top of mind**, of course, including the different mutations of the virus we're seeing come into the United States,"

---

[45] Emphasis added throughout.
[46] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*, https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport.

Waddell said. "**NPBI creates additional peace of mind during this evolving pandemic**."[47]

c.   "**This pandemic may be the first most of us have seen, but it won't be the last**, and we need to be prepared. That's why GPS is committed to science and ongoing research to ensure we have the safest, most effective technology on the market."[48]

d.   "Pathogens such as SARS-CoV2, **the new strain of coronavirus that causes COVID-19**, can reside on surfaces and be suspended in the air we breathe. NPBI technology is **designed to mitigate these harmful pathogens by safely creating and releasing ions** via a building's existing HVAC system."[49]

e.   "In the case of **SARS-CoV2** and other pathogens, contact with positive and negative ions has microbicidal effects, ultimately disrupting their surface proteins and rendering them inactive. Independent laboratory studies have shown **that NPBI technology limits the spread of viruses such as SARS-CoV2**, MRSA and E. coli."[50]

---

[47] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.
[48] *Id.*
[49] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events*, https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.
[50] *Id.*

f. "In addition, when ions come into contact with pathogens, such as the **SARS-CoV-2 virus that causes COVID-19**, they disrupt the pathogens' surface proteins. This, in turn, renders them inactive."[51]

| Pathogen | Time in Chamber | Rate of Reduction | Test Agency |
|---|---|---|---|
| SARS-CoV-2 | 30 minutes | **99.9%** | Innovative Bioanalysis |

g. [52]

h. "Imagine an individual with **COVID-19** walks into a room in your office building. With the smallest of actions – like a cough or a sneeze – harmful pathogens have been released into the air. From that moment forward, anyone who walks into the room is exposed to the virus. These scenarios happen countless times each day, and historically there have not been solutions to address the problem. That's where NPBITM comes in." Charlie Waddell, GPS Founder and CTO.[53]

i. "Though **a proven tool in the fight against COVID-19**, NPBI is just one critical measure in a comprehensive approach to improving IAQ and providing cleaner, safer indoor air."[54]

---

[51] *Id.*
[52] Archived version of GPS' website from October 24, 2020, https://web.archive.org/web/20201024175828/https://globalplasmasolutions.com/pathogen-reduction.
[53] Charlie Waddell, *The Future of IAQ Lies in Needlepoint Bipolar Ionization*, HVAC INSIDER & REFRIGERATION (July 7, 2020), https://hvacinsider.com/the-future-of-iaq-lies-in-needlepoint-bipolar-ionization/.
[54] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

j.   "…announced today industry-leading ionization testing results, demonstrating a **99.4% reduction rate on a SARS-CoV-2 (COVID-19)** surface strain within 30 minutes, the **first instance in which an air purification company has effectively neutralized SARS-CoV-2.**"[55]



k.

65.   Global Plasma Solutions' representations were largely repeated uncritically by news outlets, publications, press releases, social media, and other forms of media.

66.   Global Plasma Solutions' representations were used in the marketing efforts of its sellers, distributors, and other agents.

67.   But these representations failed to hold up when they were examined by independent academic studies and industry watchdogs.

---

[55] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.

**D. Global Plasma Solutions' Representations Are False and Deceptive**

    **a. Global Plasma Solutions' Representations to Consumers that Its Products Are Superior to Other Air Treatment Systems Are False, Deceptive, and Misleading.**

68.    As outlined above, Defendants represent NBPI as the safest, most effective technology on the market.

69.    These statements are not mere puffery because Defendants present direct comparisons to other technologies throughout its uniform, wide scale marketing campaign.

70.    For example, the following table is used multiple times in Defendants' marketing literature:



71.    These statements are made by the Defendants in order to siphon sales from the competitors that use other technologies to clean the air.

72.    If the statements were true and accurately represented, then Defendants' "superior technology" representations might be within the bounds of the law.

73.     However, many of Defendants' representations are false, misleading, and deceptive.

74.     When NPBI is compared to other technologies, "[existing] proven measures that should be taken to address airborne transmission risk include properly sized and maintained ventilation (mechanical and natural), mechanical filtration (including portable HEPA filter units), and germicidal ultraviolet light systems. Such measures are practical and often can be easily implemented; many are not costly...."[56]

75.     As described in greater detail below, many of these comparisons are false, misleading, and deceptive, and solely created to induce sales of the Products.

b. **Global Plasma Solutions' Representations to Consumers that Its Products' Claims Are Supported By Sound, Independent Testing and Can Achieve Quantified Toxin-Removal Benchmarks Are False, Deceptive, and Misleading.**

76.     The Products fail to clean the air at the rates as claimed by its "independent testing."

77.     For example, in an attempt to improve cleanliness and efficiency, Boeing conducted a technical assessment of air ionization technologies.[57]

78.     One of the tested technologies was NPBI.

---

[56] Drs. Marwa Zaatari and Marcel Harmon, *Open Letter to address the use of Electronic Air Cleaning Equipment in Buildings*, April 12, 2021, https://medium.com/open-letter-to-address-the-use-of-electronic-air/no-to-ionizers-plasma-uvpco-bc1570b2fb9b (this letter is supported by 11 other doctors).
[57] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

79.     The test results in the Huntsville location found "minimal reductions in viral inactivation."[58]

80.     The test also found only "minimal reductions in surface bacteria viability by bipolar ionization."[59]

81.     Further, the Huntsville test found "no reductions in Staphylococcus aureus, Pseudomonas aeruginosa, Enterococcus faecalis, and Enterobacter cloacae with <20.6% or <0.1 log10 reduction over a 60 minute exposure duration."[60]

82.     The "New 787-10 Ground Testing" found the reductions in Escherichia coli and MS2 Bacteriophage to be far lower than needed for cabin disinfection.[61]

83.     At the end of the assessment, Boeing found:[62]

The use of air ionization in an airplane remains inconclusive as a methodology for deployment during the SARS-CoV-2 virus pandemic. Boeing's limited testing was unable to replicate supplier results in terms of antimicrobial effectiveness. The systems were unable to properly deliver and maintain the necessary ion levels in the airplane to achieve disinfection. Similarly, laboratory-based tests did not show proper rates of disinfection with higher ion concentrations. It is pertinent to be able to demonstrate effective performance in an airplane environment given aircraft installation constraints.

84.     In summary, "Boeing's current position is that air ionization has not shown significant disinfection effectiveness for further inclusion in the Confident Travel Initiative Program."[63]

---

[58] *Id.* at 16.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 20-21.

[62] *Id.* at 22.

[63] *Id.*

85.     Boeing's results and conclusions stand in stark contrast to Defendants' statements concerning NPBI's effectiveness in an airplane environment:[64]

> In the laboratory, a test was conducted to mimic ionization conditions like that of a commercial aircraft's fuselage. Based on viral titrations, it was determined that at 10 minutes, 84.2% of the virus was inactivated. At 15 minutes, 92.6% of the virus was inactivated, and at 30 minutes, 99.4% of the virus was inactivated.

### c. Global Plasma Solutions' Representations to Consumers that Its Products Are Effective Against COVID-19 Are False, Deceptive, and Misleading.

86.     From the early days of COVID-19, Defendants GPS and Falfurrias viewed the pandemic as a potential windfall.

87.     Two days before the World Health Organization elevated the status of COVID-19 from an epidemic to a pandemic,[65] Defendants issued a press release in an attempt to capture the new burgeoning market.[66]

88.     The press release – entitled "Indoor Air Quality Technology Company Responds to Coronavirus" – was a flag-planting moment for the conspiracy. From

---

[64] *Global Plasma Solutions (GPS) Launches Needlepoint Bipolar Ionization To Virtually Eliminate Static SARS-CoV-2 with Proprietary NPBI™ Technology*, PR NEWSWIRE (September 15, 2020), https://www.prnewswire.com/in/news-releases/global-plasma-solutions-gps-launches-needlepoint-bipolar-ionization-to-virtually-eliminate-static-sars-cov-2-with-proprietary-npbi-tm-technology-860417185.html.

[65] Kathy Katella, *Our Pandemic Year—A COVID-19 Timeline*, YALE MEDICINE (March 9, 2021), https://www.yalemedicine.org/news/covid-timeline.

[66] Global Plasma Solutions, *Indoor Air Quality Technology Company Responds to Coronavirus*, March 9, 2020, https://globalplasmasolutions.com/articles/indoor-air-quality-technology-company-responds-to-coronavirus.

this point onward, the company's focus shifted and became "all about pathogens and coronavirus and Covid-19."[67]

89.    On June 10, 2020, a date where COVID-19 killed 860 Americans, GPS published a press release entitled "GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology."[68]

90.    In this press release, GPS "announced today industry-leading ionization testing results, demonstrating a 99.4% reduction rate on a SARS-CoV-2 (COVID-19) surface strain within 30 minutes, the first instance in which an air purification company has effectively neutralized SARS-CoV-2."[69]

91.    In that same release, Global Plasma Solutions' founder and CTO declared, "The testing results we achieved through our proprietary needlepoint bipolar ionization technology clearly demonstrate that Global Plasma Solutions is the gold standard in air purification."

92.    Building from the themes in its press releases, Defendant GPS describes its Products as "proven tool[s] in the fight against COVID-19."[70]

---

[67] Quoting CEO Glenn Brinckman. Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.
[68] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.
[69] *Id.*
[70] *Id.*

93.    This "proof" comes from "[i]ndependent laboratory studies  [that] have shown that NPBI technology limits the spread of viruses such as SARS-CoV2."[71]

94.    These results are summarized into a simple table:

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction | Test Agency |
|---|---|---|---|---|
| SARS-CoV-2 | 60 minutes | In-Air | **98.33%** | Innovative Bioanaylsis |
| SARS-CoV-2 | 60 minutes | Surface | **99.98%** | Innovative Bioanaylsis |

95.    The results and Defendants' statements are interpreted in a similar fashion by consumers and the general public.



a.

---

[71] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events*, https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.

b.  "We've done our homework on this. It's the only company that we found that claimed that they could kill the COVID-19 virus."[72]

### Charlotte City Club Installs Ion System that Claims to Kill COVID-19

c.                                                                          [73]

d. "The Indiana Welcome Center is installing a state-of-the-art bipolar ionization system to kill COVID-19…Third-party testing has shown the system kills 99.47% of SARS-CoV-2, the disease that causes COVID-19, within 30 minutes, Project Manager Doug Lavin said. "It's like having Purell and hand sanitizer in the air," he said. "It starts killing viruses in the air and on surfaces immediately. It has a 75% kill rate within five minutes, an 85% kill rate within 10 minutes, and a 92% kill rate within 15 minutes. Within half an hour, the kill rate is 99.47%."[74]

e. "In September, Abiding Savior Lutheran Church and School will have an air purification system installed to assist in mitigating Covid-19

---

[72] Dana Winter, *Faith Academy Gets New Technology Killing COVID-19 In The Air*, WKRG (July 22, 2020), https://www.wkrg.com/local-news/faith-academy-gets-new-technology-killing-covid-19-in-the-air/.

[73]Rob Thomas, *Charlotte City Club Installs Ion System that Claims to Kill COVID-19*, CLUB AND RESORT BUSINESS (July 14, 2020), https://clubandresortbusiness.com/charlotte-city-club-installs-ion-system-that-claims-to-kill-covid-19/.

[74] Joseph S. Pete, *Indiana Welcome Center Installs Bipolar Ionization System To Kill COVID-19*, NORTHWEST INDIANA TIMES (July 23, 2020), https://www.nwitimes.com/business/local/indiana-welcome-center-installs-bipolar-ionization-system-to-kill-covid-19/article_f88835a1-2d72-56a6-acff-f6653178cb54.html.

and other viruses, allergens and bacteria. "The installation of this air purification system will help keep our air healthier and surfaces cleaner in an environmentally friendly way. Not only has testing proven remarkable results in the killing of SARS-Cov-2, but it will also help our students who struggle with seasonal allergies," said Brian Ryherd, Principal of Abiding Savior Lutheran School. Global Plasma Solutions is the first air purification solution to test SARS-CoV-2, achieving a 99.4% reduction of the surface strain within 30 minutes. See detailed information below [reproduces GPS' June 10, 2020 Press Release]."[75]

96.    But these representations failed to hold up when scrutinized by the nation's top engineering and environmental experts.

97.    "The consistent message from experts is to avoid being too creative with airborne solutions. Stay away from worthless — or even dangerous — add-ons to filtration like bipolar ionization.…"[76]

98.    Needlepoint bipolar ionization is "an emerging technology" with "little research [ ] available that evaluates it outside of lab conditions."[77] Further, "as

---

[75] Abiding Savior Lutheran School, *Keeping Our Students* Healthy, July 24, 2020, https://www.aslsonline.org/news/2020/7/24/keeping-our-students-healthy.
[76] Drs. Alex Huffman, Delphine Farmer, and Marina Vance, *Opinion: We Need Safer Air In Colorado's Schools — But Let's Be Careful How We Get There*, THE COLORADO SUN (April 23, 2021), https://coloradosun.com/2021/04/23/safer-air-schools-opinion/.
[77] United States Environmental Protection Agency, *Air Cleaners, HVAC Filters, and Coronavirus (COVID-19)*, March 22, 2021, https://www.epa.gov/coronavirus/air-cleaners-hvac-filters-and-coronavirus-covid-19.

typical of newer technologies, the evidence for safety and effectiveness is less documented than for more established ones.…"

99.     With minimal evidence to support the technology, any representation that it is effective against COVID-19 must be based with solid science and consistent with real world application.

100.    However, the scientific community has concluded that this technology – and the testing methods used by Defendants – lack the foundation to support these lofty representations.

101.    For example, Dr. F. James Lo, an assistant professor of engineering at Drexel University states that ionization technology will "clean the air only when it [passes] through the purifier, which means it helps very little in terms of person-to-person localized virus transmission."[78]

102.    Similarly, an engineering professor from the University of North Carolina Chapel Hill believes that "[a] cheap portable HEPA filter would work many times better and have fewer side effects (possibly ozone or other unwanted chemistry)."[79]

---

[78] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22, 2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.
[79] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/.

103.    Defendants' use of company-funded, specialized studies are not independent as represented by Global Plasma Solutions.

104.    Further, the studies are designed to support Defendants' deceptive, misleading, and false lofty representations and are not applicable to real world conditions.

105.    In other words, in a real-world application, ionization is not effective against COVID-19 transmission.

106.    Defendants' representations are not only false and misleading but also the Defendants misrepresent the validity of its testing that builds the foundations for its representations.

107.    Dr. Monica Mazurek, a professor in civil and environmental engineering at Rutgers University, describes the Defendants' COVID-19 representations as "unvalidated" and the tests presented by Defendant GPS are under unmonitored conditions.[80]

108.    Further, she outlines her specific concerns, "Where is the data? Where are the facts? Where are the monitoring data?"[81]

109.    Simply, the Products "do not prevent exposure and transmission of COVID-19."[82]

---

[80] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't' Safe*, MONTCLAIR LOCAL (April 22, 2001), https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/.
[81] *Id.*
[82] *Id.*

110.    Dr. Sarah F. Evans, an Assistant Professor in the Department of Environmental Medicine and Public Health and a member of the Institute for Exposomic Research at the Icahn School of Medicine at Mount Sinai, also has concerns about Defendants' COVID-19 representations.[83]

111.    After review, Dr. Evans and her "team of pediatricians, scientists, occupational medicine doctors and industrial hygienists have concerns about the safety and efficacy of emerging air cleaning," and ultimately recommended against the Products being used in schools.[84]

112.    The National Air Filtration Association website states, "There is no direct scientific evidence of benefit, but some reduced exposure can reasonably be inferred based on the ability of some filters to remove particles that contain a SARS-CoV-2 virus."[85]

113.    However, mere inferences are insufficient to support the prominent representations made by Defendant.

114.    Dr. William Bahnfleth, a professor of architectural engineering at Pennsylvania State University also doubts the soundness of the testing methods implemented. He believes that "[m]uch of the proof of their performance is in the

---

[83] *Id.*
[84] *Id.*
[85] National Air Filtration Association, *COVID-19 (Corona Virus) and Air Filtration Frequently Asked Questions (FAQs)*, https://www.nafahq.org/covid-19-corona-virus-and-air-filtration-frequently-asked-questions-faqs/.

34

form of laboratory studies commissioned by manufacturers that are often performed under conditions that are not representative of actual application conditions."[86]

115.    In response to these commissioned studies, Dr. Bahnfleth wrote, "Many in the scientific community are skeptical."[87]

116.    Dr. Amesh Adalja, a senior scholar at the Johns Hopkins University Center for Health Security, warns that untested representations that air treatment systems can stop the spread of COVID will give people "a false sense of security."[88]

117.    When additional details about Defendants' testing methods were revealed, this "false sense of security" generated significant public concern.

118.    One review of Defendants' testing methods and representations was summarized: [89]

> Last summer, Global Plasma Solutions wanted to test whether the company's air-purifying devices could kill Covid-19 virus particles, but **could find only a lab using a chamber the size of a shoebox** for its trials. In the company-funded study, the virus was blasted with 27,000 ions per cubic centimeter. The company said it found a 99% reduction of virus. The report **doesn't say how this reduction was measured**, and in September, the company's founder incidentally mentioned that

---

[86] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.
[87] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22, 2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.
[88] *Id.*
[89] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/(emphasis added).

**the devices being offered for sale would actually deliver a lot less ion power -- 13 times less -- into a full-sized room**.

119.    Further, one testing flaw was described as "[Global Plasma Solutions] nonetheless used the shoebox results in marketing its device heavily to schools as something that could combat Covid in classrooms far, far larger than a shoebox."[90]

120.    Glenn Morrison, an engineering professor at the University of North Carolina Chapel Hill, believes that the Products' COVID-19 reductions would not be very effective under normal building conditions, outside a test chamber.[91]

121.    Defendant' GPS' funding of its own studies not only flies in opposition to Defendants' testing representations but also presents a clear conflict.

122.    Relying on company-funded studies, as one concerned parent stated, "is like only listening to advice from Philip Morris as to whether smoking is safe or not."[92]

123.    When the Products are tested in real world conditions, they fail to meet their marketed "independent testing" results.

124.    When Boeing tested the technology – under real world conditions – to see if it could be successfully implemented in its aircraft, it found:[93]

---

[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

a. "Use of air ionization in an airplane remains **inconclusive** as a methodology for **deployment during the SARS-CoV-2 virus pandemic**."

b. "Testing was **unable to replicate supplier results** in terms of antimicrobial effectiveness."

c. "The systems were **unable to properly deliver and maintain** the necessary ion levels in the airplane to achieve disinfection."

d. "Similarly, laboratory-based tests **did not show proper rates of disinfection** with higher ion concentrations."

## E. Plaintiff and Class Members Relied on Defendants' False Representations

125. Defendants' misrepresentations and false statements were woven into an extensive and long-term advertising campaign conducted during the statutory period and accelerating during the COVID-19 pandemic. Defendants spent millions of dollars to spread the misrepresentations and material omissions about the Products through websites, social media, YouTube, interviews with traditional media, and other mediums.

126. Defendants and their founders, executives, and employees authored these false and misleading representations and propagated them through various outlets, including through third party publications who repeated the claims without question. Defendants' intent was to generate substantial publicity in light of the COVID-19 pandemic that would attract customers and construct a veneer of credibility around their falsehoods. They largely succeeded.

37

127.   When questions about NPBI's efficacy were published, Defendant GPS responded by filing lawsuits.[94]

128.   The misleading representations grew like a virus because many purchasers were struggling small businesses which "boasted" about COVID-19-fighting investments in order to make customers feel safe.

129.   Plaintiff and Class Members were familiar with Defendants' representations regarding the superiority of its NPBI technology over other technologies for creating a clean air environment and the effective destruction of COVID-19. This was a critical selling point for Plaintiff and Class Members, as they hoped to purchase the most effective air treatment system available. And this was core theme in Defendants' advertising.

130.   Plaintiff and Class Members also relied on various other misrepresentations and material omissions made by Defendants in purchasing the Products. Plaintiff and Class Members were impressed by Defendants' claims that the Products are capable of achieving quantified benchmarks (for example, that its technology can reduce COVID-19 by 98.33% within 60 minutes), which were typically communicated in text, tables, and graphs. But these claims are misleading as they are the results of controlled test conditions and have little relevance to the capabilities of the Products when operating in the real world.

---

[94] *See Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 3:21-cv-02884-TSH (N.D. Ca. 2021); *Global Plasma Solutions, Inc. v. D Zine Partners, LLC and Marwa Zaatari*, 3:21-cv-00884-D (N.D. Tx. 2021);  *Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 1:21-cv-01059-MHC (N.D. Ga. 2021).

131.    Defendants' claims were bolstered by Defendants' assertions that they were communicating the results of "independent testing." But it is now clear that these tests were anything but independent tests as they were critically flawed and funded by Defendants GPS and Falfurrias.

132.    Additionally, this is confirmed by the independent testing conducted by professors at the Illinois Institute of Technology, Portland State University, and Colorado State University.[95]

133.    Defendants' messaging to consumers included detailed information concerning the CARES ACT.

134.    For example, on the GPS website, there is an entire page dedicated to the topic:[96]

## How to Channel the CARES Act into Cleaner, Safer Indoor Air

135.    On this page, Defendant GPS provides the roadmap for purchasers to obtain government funding to purchase its Products. For example: [97]

---

[95] *See* Yicheng Zeng, Prashik Manwatkar, Aurélie Laguerre, Marina Beke, Insung Kang, Akram S. Ali, Delphine K. Farmer, Elliott T. Gall, Mohammad Heidarinejad, Brent Stephens, *Evaluating A Commercially Available In-Duct Bipolar Ionization Device For Pollutant Removal And Potential Byproduct Formation*, BUILDING AND ENVIRONMENT, Volume 195, 2021, 107750, ISSN 0360-1323, https://doi.org/10.1016/j.buildenv.2021.107750.

[96] Global Plasma Solutions, *How to Channel the CARES Act into Cleaner, Safer Indoor Air*, https://globalplasmasolutions.com/articles/how-to-channel-the-cares-act-into-cleaner-safer-indoor-air.

[97] *Id.* (emphasis added). *See also, e.g.,* Exhibits 22 and 23.

39

a. "Your company may be able to **tap into federal funds** to improve indoor air quality and fight pathogens such as COVID-19. Several provisions outlined in new legislation allow schools and universities, health care providers and small businesses **to tackle air quality improvement projects with minimal financial impact**."

b. "Small Businesses: As payments from the second round of the Paycheck Protection Program (PPP) begin rolling out, small businesses can apply funds to utility expenses and other related costs as a result of the COVID-19 pandemic."

136. Purchasers relied upon these representations that they were obtaining a product that would not only make the air cleaner but also eliminate the COVID-19 virus. For example, numerous purchasers used CARES ACT funds to pay for the Products:





137.    Purchasers relied upon these representations that they were obtaining a product that would not only make the air cleaner but also eliminate the COVID-19 virus.

138.    One critical factor for Plaintiff's and Class Members' decision to purchase the Products was the belief that it could safely protect its employees and customers from COVID-19, and that the representations made by Defendants were based on sound, scientific studies.

139.    Defendants amplified the deceptions in many venues over a multi-year period with the intent to instill in consumers the belief that the Products were vastly superior to existing technology and capable of providing safe, clean air that lowers, removes, and eradicates the COVID-19 virus. Plaintiff and Class Members saw these claims and relied on them in purchasing the Products, believing that they were buying the best air treatment systems available when in fact they were purchasing systems that are largely ineffective.

41

### F. Global Plasma Solutions Concealed these Deceptions

140.    Defendants designed, manufactured, marketed, and sold the Products while knowingly concealing these defects and deceptions.

141.    As described by independent testing sources, the Products are incapable of performing as marketed. The Products are not able to "safely" clean the air of the COVID-19 virus. Consequentially, Defendants' claims regarding the performance, capabilities, and therapeutic benefits of the Products are false, deceptive, and misleading.

142.    Defendants actively concealed the defects in the Products.

143.    Defendants knew that the Products failed to safely clean the air of COVID-19 because, in part, it was shown to be ineffective in internal testing that was suppressed by Defendants.

144.    When scientists refuted Defendants' claims, Defendants implemented a coordinated litigation campaign to silence the truth.

145.    As part of this coordinated campaign, Defendant GPS sued academic journals that published academic articles that exposed Defendants' deceptions in an attempt to further conceal the truth.[98]

---

[98] *See Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering.* 4:21-cv-02884 (N.D. Cal.); *Global Plasma Solutions Inc v. D Zine Partners LLC,* 3:21-cv-00884, (N.D. Tex.); *Global Plasma Solutions, Inc. v. Elsevier Inc.*, 3:22-cv-00034 (W.D. N.C.).

146.    After the pandemic ended and demand for the Products evaporated,

Defendant GPS settled the majority of the cases it filed against scientists

attempting to reveal the truth.[99]

147.    When testing of the Products resulted in negative outcomes,

Defendants GPS and FCP suppressed or altered the results.

148.    The concealment of tests showing the Products' ineffectiveness were

suppressed by decision makers high in the companies.

149.    To further the deception, Defendants GPS and FCP staged tests with

altered devices that were knowingly staged in conditions that could not be

replicated in real world conditions.

150.    Defendants' claims were material to Plaintiff and Class Members but

Defendants did not disclose to purchasers of the Products that the devices were

defective and unable to fulfill many of Defendants' advertising claims. As a result,

Plaintiff and Class Members purchased devices that they would not have otherwise

purchased or for which they would have paid less. Plaintiff and Class Members

relied on Defendants' assertions that the Products were capable of producing

specific outcomes— e.g., creating a safe environment by safely eradicating the

---

[99] *Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering.* 4:21-cv-02884 (N.D. Cal.), ECF No. 81; GPS, *GLOBAL PLASMA SOLUTIONS, INC.'S LAWSUIT AGAINST DR. MARWA ZAATARI, D ZINE PARTNERS LLC, AND ENVERID SYSTEMS INC. COMES TO A RESOLUTION* (Mar. 23, 2023), https://gpsair.com/articles/global-plasma-solutions-inc-s-lawsuit-against-dr-marwa-zaatari-d-zine-partners-llc-and-enverid-systems-inc-comes-to-a-resolution.

COVID-19 virus —and received devices that were unfit for the purposes for which they were purchased.

151.    Defendants intended to deceive consumers in order to increase their revenues and profits.

152.    Defendants' suppression of the truth led to exponential growth in revenues and profits.

153.    Defendants' "profits over people" scheme won them acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of Plaintiff and Class Members in violation of all applicable laws referenced herein.

### G. Falfurrias and GPS Participated in a Conspiracy to Defraud

154.    In the fall of 2018, Falfurrias acquired GPS.[100]

    a.  Prior to acquiring GPS, Falfurrias had not been involved in the marketing and sale of air filtration or air cleaning systems.

    b.  Immediately after the purchase, Falfurrias moved GPS from Savannah, Georgia to Charlotte, North Carolina where Falfurrias is headquartered.[101]

    c.  Additionally, Falfurrias replaced GPS founder Charles Waddell with its handpicked CEO Glenn Brinckmann.[102]

---

[100] *Charlotte investment firm buys air purification tech company*, WRALTECHWIRE (Oct. 5, 2018), https://wraltechwire.com/2018/10/05/charlotte-investment-firm-buys-air-purification-tech-company/.
[101] *Id.*
[102] *Id.*

d. According to Falfurrias' Managing Partner, Ed McMahan, Brinckmann was selected to "help Global Plasma Solutions maximize its growth potential."[103]

e. Brinckmann was not the only key employee directed by Falfurrias. Falfurrias also placed one of its partners – Ken Walker - as the Executive Chairman ("Chairman of the Board") for GPS. Additionally, Blake Frawley was named GPS' VP of Finance. [104]

f. GPS Founder Charles Waddell was "delighted to have a new strategic partner with Falfurrias Capital's operational resources and network[.]"[105]

g. In October 2018, Global Plasma Solutions, Inc.'s registration to conduct business in the State of Georgia was completed by Falfurrias partner Joseph J. Schonberg, using his FCP email address, and lists the address of FCP's headquarters.

| 2. | Joseph J. Schonberg | | | |
|---|---|---|---|---|
| | Name of Filing Person | | | |
| | 100 North Tryon Street, Suite 4100 | Charlotte | NC | 28202 |
| | Address | City | State | Zip Code |
| | jschonberg@fcp.us.com | | (704) 376-0042 | |
| | Filer's Email Address | | Telephone Number | |

h. The October 2018 registration identifies only three individuals: two FCP partners and FCP-selected CEO Glenn Brinckman.

---

[103] *Id.*
[104] FALFURRIAS CAPITAL, *GPS Air*, https://falfurriascapital.com/portfolio/gps-air/.
[105] FALFURRIAS CAPITAL, *Falfurrias Capital Partners Invests in Global Plasma Solutions*, https://falfurriascapital.com/falfurrias-capital-partners-invests-in-global-plasma-solutions/.

| 6. | Glenn A. Brinckman | 9 Grey Rocks Court | Gastonbury | CT | 06033 |
| | Officer / CEO | Address | City | State | Zip Code |
| | Joseph J. Schonberg | 100 North Tryon Street, Suite 4100 | Charlotte | NC | 28202 |
| | Officer / CFO | Address | City | State | Zip Code |
| | W. Edwin McMahan, Jr. | 100 North Tryon Street, Suite 4100 | Charlotte | NC | 28202 |
| | Officer / Secretary | Address | City | State | Zip Code |

       i.    From the moment Falfurrias acquired the majority of GPS, it directed the marketing and promotion of the Products.

155.    Falfurrias and GPS conspired to misrepresent NPBI's effectiveness to the public to convince them to purchase the Products.

156.    Defendants conspired to "grow the company in ways it couldn't have before."[106]

157.    This conspiracy generated hundreds of millions of dollars for Defendants.

158.    GPS worked closely with its "strategic partner,"[107] Falfurrias Capital, to grow GPS' sales by hundreds of millions of dollars.

159.    This growth came from Defendants' fraudulent scheme to market and represent that the Products could eliminate COVID as described herein.

160.    Falfurrias created and implemented the strategic marketing plans concerning COVID.

161.    Falfurrias employees actively monitoring the COVID testing and routinely debriefed on negative press coverage of NPBI technology.

---

[106] McGuireWoods, *Up-and-Coming Women in PE to Know: Katie-Rose Higgins*, https://www.mcguirewoods.com/client-resources/alerts/2020/7/up-and-coming-women-in-pe-to-know-katie-rose-higgins/.

[107] Falfurrias Capital, *Falfurrias Capital Partners Invests in Global Plasma Solutions*, https://falfurriascapital.com/falfurrias-capital-partners-invests-in-global-plasma-solutions/.

162.    As part of its efforts to effectuate the conspiracy, Defendant Falfurrias exerted control over the plan by selecting and controlling GPS' Board of Directors.

163.    Falfurrias-selected CEO of GPS, Glenn Brinckmann, regularly communicated with high level Falfurrias employees about the direction and strategy of GPS.

164.    Falfurrias' involvement was at all levels of the conspiracy. From high-level activities including the selection of key executives to "boots on the ground" activities including the crafting of sales pitch presentations and selecting key employees make those sales pitches.

165.    GPS and high-level employees of Falfurrias pushed for coronavirus marketing as a big opportunity to profit handsomely.

166.    Falfurrias provided support, strategy, and research when GPS feared being exposed by Enverid and ASHRAE.

167.    Falfurrias controlled messaging to deflect from studies showing that NPBI did not work as represented.

168.    Falfurrius developed strategies to fight academic papers and scientists that revealed that NPBI did not work as marketed.

169.    Falfurrias benefited handsomely as part of the conspiracy.

    a.    For example, it received a $225,000,000 dividend from GPS on December 18, 2020.

    b.    In other words, just 6 months after claiming that the NPBI technology could "virtually eliminate" COVID, Defendants were able to obtain a

47

$225,000,000 loan based on future revenues with the bulk of those funds heading to Defendant Falfurrias as a dividend.

170.   Defendant Falfurrias acted as Defendant GPS' operating partner in the conspiracy.

171.   Defendant Falfurrias, Defendant GPS, sales agents of the Products, distributors of the Products, and other individuals and entities which will be uncovered as part of discovery operated as an enterprise to commit acts of fraud and theft by deception ("the Enterprise").

172.   The Defendants operated with the intent to defraud Plaintiff and Class Members.

**H. Plaintiff's Purchase and Installation**

173.   In June 2020, Plaintiff agreed to purchase one hundred and sixty-eight (168) GPS-FC-3-BAS units in Georgia.

174.   The devices were manufactured, marketed, and distributed by Defendants.

175.   Plaintiff's initial payment for these devices was made in August 2020.

176.   Installation of the devices started in August 2020.

177.   Installation of the devices was completed.

178.   Plaintiff paid approximately $98,475.00 for the devices and installation.

179.   Plaintiff was in the market for a device to improve air quality, particularly one that would mitigate the effects of COVID-19.

180.    Prior to purchasing, Plaintiff had observed and read Defendants' representations on its website, brochures, interviews, articles, videos, and social media that its Products could clean the air, effectively eliminate COVID-19, and was supported by sound independent testing. Further, Plaintiff observed and read similar representations that were repeated by distributors and sellers of the Products.

181.    Plaintiff has seen Defendants' representations regarding GPS' superior air treatment system, which persuaded Plaintiff to continue using the devices.

182.    At all relevant times, Plaintiff used and maintained the devices as would any reasonable consumer and in accordance with Defendants' instruction.

183.    Plaintiff would not have purchased the Product if it had known about the defects or that Defendants were misrepresenting the performance, capabilities, and benefits of the Product. In particular, it would not have purchased the Product if he had known that Defendants' representations were false and that Defendants concealed the product's defective nature.

184.    In 2024, Plaintiff discovered that the NPBI technology and the Products were not accurately represented by the Defendants.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

185.    Any applicable statute of limitations has been tolled by Defendants' false representations concerning the performance and quality of the Products, and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding the Products and

49

could not have reasonably discovered that the Products did not conform to the Defendants' representations.

186.    Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the performance and efficacy of the Products. As alleged herein, the presence or risk of COVID-19 virus was material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and Members of the Class would not have discovered through the existence of reasonable diligence that the Products did not work to eliminate the COVID-19 virus.

187.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and the Class the true standard, quality, and grade of the Products.

188.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendants' knowing, active, and affirmative concealment.

189.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statues of limitations in defense of this action.

## CLASS ALLEGATIONS

190.    Plaintiff brings this action on behalf of the following class (the "Class"):

All persons and entities in the State of Georgia who purchased the Products within the state or from the state.

191.    The Class consists of an as of yet undetermined number of consumers. This Class is so numerous that joinder of all members of the class is not practicable.

192.    There are questions of law and fact common to each class claimant including:

a.    whether Defendants misrepresented material facts concerning the Products;

b.    whether Defendants misrepresented material facts concerning the Products in the marketing of every Product;

c.    whether Defendants' conduct was fraudulent or deceptive;

d.    whether Defendants have been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon them by Plaintiff and the Class;

e.    whether Plaintiff and the Class are entitled to equitable and/or injunctive relief; and

f.    whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

193.    Plaintiff will fairly and adequately assert and protect the interests of the Class because (a) the attorneys for the Plaintiff are experienced in class action

51

litigation; and (b) there is no conflict of the interest between the Plaintiff and the interests of the Class, but rather the Plaintiff and the Class share common interests in the subject matter hereof and the remedy sought.

194.    A class action provides a fair and efficient method for the adjudication of this controversy in that:

a.  the common questions of law and fact predominate over any questions effecting only individual class members;

b.  if individual actions are required to be brought by each of the class members, a multiplicity of suits will result, causing great hardship to the class members and undue burden to the court;

c.  the prosecution of separate actions of individual class members would create a risk of inconsistent judgments in that adjudication with respect to individual class members could, as a practical matter, be dispositive of the causes of other class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests;

d.  this Court is the appropriate forum for the litigation of the claims of the entire Class;

e.  in the view of the issues concerning damages and the expense of the litigation, the separate claims of the individual class members are insufficient to support separate actions; and

f.   in the view of the efficiency achieved in a class action, the benefit to be

gained by the Class in the form of damages will exceed the cost of

litigation.

## CAUSES OF ACTION

### COUNT I
### Violations of Georgia RICO,
### O.C.G.A. § 16-14-1, *et seq.*

195.   Plaintiff repeats and realleges each and every allegation contained in

the foregoing paragraphs as if fully set forth herein.

196.   Plaintiff asserts this claim individually and on behalf of the Class.

197.   The Defendants conducted and continue to conduct their business

through legitimate and illegitimate means in the form of an enterprise. At all

relevant times, the Defendants were "persons" under O.C.G.A. § 16-4-3 and because

they are entities capable of holding, and do hold, "a legal or beneficial interest in

property."

198.   O.C.G.A. § 16-4-4 makes it unlawful "for any person, through a pattern

of racketeering activity or proceeds derived therefrom, to acquire or maintain,

directly or indirectly, any interest in or control of any enterprise, real property, or

personal property of any nature, including money," and makes it unlawful for "any

person employed by or associated with any enterprise to conduct or participate in,

directly or indirectly, such enterprise through a pattern of racketeering activity."

199.   O.C.G.A. § 16-14-3 defines an enterprise as any "person, sole

proprietorship, partnership, corporation, business trust, union chartered under the

laws of this state, or other legal entity; or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities."

200.    The Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the air treatment market by unlawfully and surreptitiously increasing the volume of devices they sold. However, the Defendants are not permitted to engage in a limitless expansion of their market through the unlawful and deceptive sales of the Products.

201.    Finding it impossible to legally achieve their ever-increasing sales ambitions, members of the Enterprise systematically and fraudulently violated their duty to accurately represent the performance, characteristics, and capabilities of the Products.

202.    Through the Defendants' scheme, sales people and distributors repeatedly engaged in unlawful and deceptive sales of the Products throughout Georgia.

203.    In doing so, the Defendants generated hundreds of millions of dollars in unlawful sales at a rapid pace.

204.    For example, in less than a year since the start of the COVID-19 pandemic, Defendant FCP received a $225,000,000 dividend from Defendant GPS.

205.    The Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

206.   Defendants' illegal scheme was hatched between Defendants and executed in perfect harmony by each of them. In particular, each of the Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to collectively as the "Enterprise").

207.   The Defendants' scheme allowed them to make hundreds of millions of dollars in unlawful and deceptive sales from consumers like Plaintiff.

208.   As a direct result of the Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract hundreds of millions of dollars from the fearful American public, while entities and people like the Plaintiff and Class Members experienced significant injury caused by Defendants' deceptions. As explained in detail herein, the Defendants' misconduct violated O.C.G.A. § 16-14-6 and Plaintiff and Class Members are entitled to treble damages for its injuries and damages under O.C.G.A. § 16-14-6.

209.   Through the Enterprise, Defendants committed, *inter alia*, theft by deception in a widescale, repetitive fashion that harmed Plaintiff and other victims throughout Georgia. *See* Ga. Code Ann. § 16-8-3.

a. "[T]heft by deception occurs when a person obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." *Hansford v. Veal*, 369 Ga. App. 641, 649, 894 S.E.2d 215, 224 (2023).

b. "[O]ne who obtains funds by making promises of the performance of services which he does not intend to perform or knows will not be

performed may be guilty of theft by deception under OCGA § 16-8-3 (b) (5)." *Id.* at 224–25.

210.    Defendant Falfurrias controlled the Enterprise — that is, it used Defendant GPS as the vehicle through which an unlawful pattern of racketeering activity was committed. As set forth below, Defendant Falfurrias controlled the resources and instrumentalities of Defendant GPS and used that control to perpetrate a number of fraudulent and deceptive schemes, including fraudulently misrepresenting or omitting the truth about the Products to consumers and the public at large.

211.    Defendant Falfurrias exerted even further influence over the GPS Board of Directors and installed its own personnel in key roles at GPS, cementing its direction of the Enterprise.

212.    As described herein, each Defendant participated in the operation or management of the Enterprise, and directed the affairs of the Enterprise through a pattern of racketeering activity, including masterminding schemes to defraud that were carried out by and through the Enterprise with specific intent to defraud and commit theft by deception.

213.    Defendant Falfurrias directly exercised control and participated in the Enterprise.

    a.    As described in Section G of the Facts of this Complaint, Defendant Falfurrias was active in the strategy and operations of the Enterprise

and led the Enterprise through its tight control of GPS' Board of
Directors.

b. Defendant Falfurrias also benefited the most from the conspiracy.

c. Defendant Falfurrias directly transmitted statements to support the
Enterprise's efforts to fraudulently market the Products.

d. Defendants also directly distributed fraudulent statements that NPBI
was effective in eliminating COVID-19 in real-world conditions and
that this was supported by independent, third-party testing.

214. Defendants broadcasted these fraudulent statements through a
network of distributors and sales agents throughout Georgia as part of the
Enterprise.

215. Moreover, to further bolster its influence and control of the Enterprise,
Defendant Falfurrias installed key Falfurrias partners and employees into
leadership positions at Defendant GPS.

216. As detailed herein, the operation of the Enterprise, as directed by
Defendant Falfurrias, included several schemes to defraud that helped to further
the goals of the Defendants—i.e., exploiting the public's legitimate fear of COVID-
19 for the Defendants to reap large profits.

217. As part of their Enterprise, Defendants engaged in a pattern of
racketeering activities to defraud and commit theft by deception. These activities
included, *inter alia*, the following schemes:

a. Fraudulent Marketing Scheme

57

    i. As described throughout this Complaint, Defendant Falfurrias directed and caused the Enterprise to make false and misleading advertisements to be transmitted to consumers including Plaintiff.

    ii. Defendant Falfurrias also provided specific direction as to the content of the sales and marketing materials, and that content include false, misleading, and deceptive statements designed to induce consumers, including Plaintiff, to purchase the Products.

    iii. Through the allegations above, Plaintiff has shown a direct connection between the Defendants and this fraudulent scheme, including involvement in directing, in some part, the affairs of the Enterprise.

b. CARES ACT Scheme

    i. As described throughout this Complaint, the Defendants who controlled the Enterprise acted individually and in concert to expand to mislead customers about the Products.

    ii. To increase sales and reduce inquiry by the consuming public, Defendants advertised and educated potential customers on pandemic relief funds which would allow the consuming public to purchase the Products.

    iii. Through the allegations above, Plaintiff has shown a direct connection between the Defendants and this fraudulent scheme,

including personal involvement in directing, in some part, the affairs of the Enterprise.

218.  As described herein, the Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public by (1) transmitting advertisements that fraudulently and deceptively represented the Products' ability to kill COVID-19 in real world conditions; (2) causing false and misleading statements regarding the Products' ability to kill COVID-19 in real world conditions to be posted on the GPS website; (3) causing false and misleading statements regarding the Products' ability to kill COVID-19 to be redistributed throughout the network of distributors and sales agents; (4) distributing statements and advertisements that the representations concerning the Products' effectiveness was supported by independent, third-party testing; (5) causing thousands of the Products containing false and misleading statements regarding the performance of the Products to be sold; (6) representing to consumers and the public at-large that the Products were created and designed as an effective air cleaning device; and (7) making fraudulent statements to the public (including through advertising), state governments, and the federal government to use pandemic-relief-focused funds to cover the purchase price and installation of the Products.

219.  The Defendants committed these racketeering acts intentionally and knowingly, with the specific intent to defraud and to personally or directly profit from these actions.

220.   As explained herein, the Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity by committing fraud and theft by deception.  To the extent that an officer of either Defendant made a particular statement in furtherance, the Defendants who controlled the Enterprise caused those statements to be made through their control of the Enterprise and through their control of the communications that the Enterprise was disseminating to the general public.  As detailed herein, these statements are alleged to be part of the fraudulent schemes masterminded by the Defendants who conducted the affairs of the Enterprise.

221.   The acts described herein were made in furtherance of the Defendants' scheme and common course of conduct, thereby increasing sales of the Products and causing each Defendants' profits to soar. The Defendants committed these acts either by directly approving certain fraudulent statements or by setting in motion a scheme to defraud that would reasonably lead to such fraudulent statements being transmitted to consumers, including Plaintiff, in order to commit theft by deception.

222.   As described herein, the Defendants used the Enterprise to further schemes to defraud the consuming public and boost profits by claiming that the Products could effectively COVID-19 in real-world conditions and these statements were supported by independent testing.

223.   The Defendants had a specific intent to deceive and defraud the public. For example, as alleged above, the Enterprise made repeated representations and statements that the Product could kill COVID-19 in real world conditions and these

statements were supported by independent, third-party testing. These statements were false. Each of the Defendants knew these statements were false but caused these statements to be made anyway. Similarly, the Defendants caused these false representations to be transmitted through its network of distributors, advertisers, and sales people. These false and misleading statements concerned material information regarding the real-world performance of the Products against COVID-19 and other irritants, which Defendants' own internal data and studies, showed were false. Moreover, each of the Defendants had direct involvement in marketing statements by the Enterprise and thus caused such statements to be made, notwithstanding that they knew they were false for the reasons detailed herein.

224.   The Defendants intended the public to rely on these false transmissions, and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

225.   The public relied on the Enterprise's deceptions. For example, after the publication of the June 2020 press release that told the public that the Products "virtually eliminate" COVID, sales skyrocketed and exceeded annual benchmarks in just single months. Through the Enterprise, Defendants spoke, the public listened and relied on statements that were transmitted by the Defendants, and the Defendants profited at previously unseen levels. In other words, Defendants' scheme worked as they planned.

226.   Many of the precise dates of the fraudulent acts have been deliberately hidden and cannot be alleged without access to the Defendants' books and records.

Plaintiff has, however, described the types of predicate acts, including the specific types of fraudulent statements upon which, the Defendants engaged in fraudulent activity in furtherance of their overlapping schemes.

227.    These were not isolated incidents. Instead, the Defendants engaged in a pattern of racketeering activity by committing thousands of related predicate acts within a five-year period, in the form of fraud and theft by deception, and there remains a threat that such conduct will continue or recur in the future. That each Defendant participated in a variety of schemes involving thousands of predicate acts of fraud and theft by deception establishes that such fraudulent acts are part of the Enterprise's regular way of doing business. Moreover, Plaintiff expects to uncover even more coordinated, predicate acts of fraud as discovery in this case continues.

228.    The Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

229.    The Defendants agreed to facilitate the operation of the Enterprise through a pattern of racketeering.

230.    The Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise, as detailed herein.

231.    The acts in furtherance of the conspiracy attributable to the Defendants include each of the predicate acts underlying the Defendants' use of the Enterprise to, directly or indirectly, engage in a pattern of racketeering activity as

described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the members of the Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal scheme and common course of conduct. Where a Defendant did not commit a predicate act itself, it agreed to the commission of the predicate act.

232.    Plaintiff and Class Members were directly injured by reason of the RICO violations, and such injury would not have occurred but for the predicate acts of the Defendants, which also constitute the acts taken by the Defendants in furtherance of their conspiracy. The combined effect of the Defendants' acts of fraud in furtherance of their conspiracy were inducing Plaintiff and Class Members to purchase the Products that it would not have purchased, or—in the alternative—to pay more for the Products than it would have otherwise paid, had it known that the Products were not effective at eliminating COVID-19 or if it had known that the representations were not supported by independent testing.

233.    There are no intervening acts or parties that could interrupt the causal chain between the RICO Act violations in furtherance of their RICO conspiracy and Plaintiff's injuries. The Defendants, in furtherance of their conspiracy to operate and manage the Enterprise made false and misleading statements directly to consumers, like Plaintiff, to obtain their money.

234.   At all relevant times, the Defendants were associated with the Enterprise and agreed and conspired to violate O.C.G.A. § 16-14-4(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

235.   Defendants conspired, as alleged more fully herein, by conducting the affairs of the Enterprise through a pattern of racketeering activity.

236.   The Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity, within the statutory period, as described herein.

237.   The multiple acts of racketeering activity that the Defendants committed, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

238.   The Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Enterprise's objectives through common misrepresentations, concealments, and material omissions.

239.   The Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff's injuries.

240.   Plaintiff and Class Members sustained damage as a direct and proximate result of Defendants' fraudulent conduct. Among other damages, Plaintiff and Class Members did not receive the value of the premium price they paid for the

Products. Plaintiff and Class Members would not have purchased Products – or would have purchased them at a much lower price – had they known of the Products' inability to safely and effectively cleanse the air of the COVID-19 virus.

241.   Defendants made false representations concerning the performance and quality of the Products, and the quality of the Defendants' brand. Further, Defendants concealed and suppressed material facts concerning the performance and quality of the Products, the Products' capabilities and benefits, and the Products' defects. Defendants knew, or in the exercise of reasonable diligence should have known, of the defects and misrepresentations of the capabilities and benefits of the Products but failed to disclose these facts prior to or at the time it marketed Products and sold them to consumers. Defendants engaged in this fraud in order to increase sales of the Products and command a higher price for its Products.

242.   Plaintiff and Class Members had no reasonable way of knowing that Defendants' representations were false and misleading, or that Defendants had omitted to disclose highly important details relating to the Products' performance and the defects.

243.   Plaintiff and Class Members did not and could not reasonably discover Defendants' deception on their own.

244.   Defendants had a duty to disclose the true performance of the Products because the scheme and its details were known and accessible only to Defendants; Defendants had superior knowledge and access to the relevant facts; and

Defendants knew these facts were neither known to, nor reasonably discoverable by Plaintiff.

245.   Defendants still have not made full and adequate disclosures and continues to defraud by concealing material information regarding the true performance of the Products.

246.   Plaintiff and Class Members were unaware of the omitted material facts and would not have purchased the Products had it known of the facts Defendants suppressed. Plaintiff's actions in purchasing the Products were justified. Defendants were in exclusive control of the material facts and such facts were not reasonably known to the Plaintiff and Class Members.

247.   Plaintiff and Class Members relied to their detriment upon Defendants' representations, fraudulent misrepresentations, and material omissions regarding the quality of the Products, the Products' effectiveness, and the Products' defects in deciding to purchase the devices.

248.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being, to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

249.   Plaintiff and Class Members seek all legal and equitable relief as allowed by law, including *inter alia* actual damages, treble damages, equitable

relief, forfeiture as deemed proper by the Court, attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and in favor of the Class, and against Defendants, as follows:

a. For an order certifying this case to proceed as a class action, designating Plaintiff as the Class representative, and its counsel as Class Counsel;

b. For an order declaring the Defendants' conduct violates the statutes and laws referenced herein;

c. For an order awarding, as appropriate, compensatory and monetary damages, statutory damages, treble damages, and restitution to Plaintiff for all causes of action;

d. For an order requiring Defendants to immediately cease and desist from selling its misrepresented Products in violation of law; enjoining Defendants from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

e. That Plaintiff and the Class be awarded punitive damages against each of the named Defendants, pursuant to O.C.G.A. § 51-12-5(b);

f. That this Court enter an order taxing all costs and expenses of these proceedings, including reasonable attorneys fees, against Defendants pursuant to O.C.G.A. § 13-6-11; and

67

g. That Plaintiff and the Class be awarded such other and further relief as this Court deems necessary, proper, and just.

**Plaintiff demands a trial by jury of all issues so triable.**

Dated: August 13, 2024                    Respectfully submitted,


                                          THE KEETON FIRM LLC

                                          */s/ Steffan T. Keeton*
                                          Steffan T. Keeton
                                          Georgia Bar No. 588379
                                          100 S Commons, Ste. 102
                                          Pittsburgh, PA 15212
                                          Phone: (888) 412-5291
                                          stkeeton@keetonfirm.com


                                          REICH & BINSTOCK LLP
                                          Dennis C. Reich, Esq.*
                                          4265 San Felipe, Suite 1000
                                          Houston, TX 77024
                                          Phone: (713) 622-7271
                                          Fax: (713) 623-8724
                                          dreich@reichandbinstock.com
                                          **pro hac vice* forthcoming


                                          THE MILLS LAW FIRM
                                          Michael A. Mills, Esq.*
                                          8811 Gaylord Drive
                                          Suite 200
                                          Houston, TX 77024
                                          Phone: (832) 548-4414
                                          Fax: (832) 327-7443
                                          mickey@millsmediation.com
                                          **pro hac vice* forthcoming


                                          *Attorneys for Plaintiff*

68

Fulton County Superior Court
***EFILED***MH
Date: 8/14/2024 2:07 PM
Che Alexander, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

**136 PRYOR STREET, ROOM J2 C-103, ATLANTA, GEORGIA 30303**

### SUMMONS

BELLYARD PARTNERS, LLC, on behalf of itself

and all others similarly situated,

**Plaintiff,**

**vs.**

FALFURRIAS CAPITAL PARTNERS, LP,

GLOBAL PLASMA SOLUTIONS INC.,

**Defendant**

) **Case**
) **No.:**  24CV010221
)
)
)
)
)
)
)
)
)
)
)
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylertech.cloud/OfsEfsp/ui/landing (unless you are exempt from filing electronically) and serve upon plaintiff's attorney, whose name and address is:

> The Keeton Firm LLC
> 100 S Commons
> Ste. 102
> Pittsburgh, PA 15212

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This_____8/13/2024_____day of_____, 20 _____

Honorable Ché Alexander, Clerk of

Superior Court

By _____

Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you    _____, 20_____

Deputy Sherriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**